IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LIZABETH RAMOS-TROCHE,

    Plaintiff,

        v.                                                           CIVIL NO. 12-1334 (MEL)

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

**OPINION AND ORDER**

**I.   PROCEDURAL HISTORY**

Lizabeth Ramos-Troche ("plaintiff" or "claimant") was born in 1969 and has completed high school. (Tr. 336, 445). Prior to her initial application for Social Security disability benefits, plaintiff had worked as a nurse at a hospital between March 11, 1991, and October 4, 2006. (Tr. 440). On December 19, 2007, plaintiff filed an application for Social Security disability benefits, alleging disability on the basis of, *inter alia*, seizures, migraine, sickle cell trait, fibromyalgia, bronchial asthma, and depression. (Tr. 439).[1] The alleged onset date of the disability was October 4, 2006, whereas the end of the insurance period was December 31, 2011. (Tr. 15). Plaintiff's application was denied initially and upon reconsideration.

Plaintiff made a timely request for a hearing before an Administrative Law Judge ("ALJ"). Although she waived her right to appear personally, her counsel appeared on her behalf at the hearing held on January 19, 2010. (Tr. 30, 428). Dr. Marieva Puig ("Dr. Puig"), a vocational expert, provided testimony at the hearing. (Tr. 30). The ALJ rendered a decision on February 18, 2010, denying plaintiff's claim. (Tr. 24–25). The Appeals Council denied

---

[1] In her initial application, plaintiff also alleged disability due to arthritis, but has not pointed to any evidence in the medical record to support such assertion. See ECF No. 18.

plaintiff's request for review on March 15, 2012. (Tr. 1). Therefore, the ALJ's opinion became the final decision of the Commissioner of Social Security (the "Commissioner" or "defendant").

On May 11, 2012, plaintiff filed a complaint seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), alleging that the ALJ's decision was not based on substantial evidence. ECF No. 1. On October 15, 2012, defendant filed an answer to the complaint and a certified transcript of the administrative record. ECF Nos. 5; 6. Both parties have filed supporting memoranda. ECF Nos. 18; 19. For the reasons set forth below, the Commissioner's decision is affirmed.

## II.   RELEVANT MEDICAL EVIDENCE

On October 24, 2006, plaintiff was admitted to Perea Hospital due to a "seizure like episode." (Tr. 619; see Tr. 105–167). Plaintiff was experiencing fatigue and a decrease in tolerance for exercise. (Tr. 108–09). An EEG conducted during her stay revealed "abnormal findings." (Tr. 108). It was concluded that she experienced a petit mal seizure. She was prescribed medication and discharged on October 30, 2006. Plaintiff visited Dr. Alfredo Pérez Canabal ("Dr. Pérez"), a neurologist, at various times between September 29, 2005, and August 14, 2007; between September 25, 2008, and February 27, 2009; and once more on August 21, 2009. (See Tr. 168–78, 224–33).[2]

According to treatment summary notes, plaintiff would visit Dr. Humberto Olivencia Rabell ("Dr. Olivencia"), an internal medicine specialist, between October 6, 1996, and August 19, 2008. (See Tr. 192–94, 250–335, 544–48).[3] In a report to the Social Security Administration

---

[2] Both the ALJ and plaintiff point out that Dr. Pérez's treatment notes are illegible. (See Tr. 20; ECF No. 18, at 9).
[3] At a different point, Dr. Olivencia indicated that plaintiff's first visit occurred on October 6, 1992, rather than October 6, 1996. (Compare Tr. 544 with Tr. 193–94). Ultimately, this discrepancy is immaterial. Evidence outside of the disability insurance period is ordinarily irrelevant but for those instances in which it can shed some light on claimant's conditions during said period of time. Cf. Padilla Pérez v. Sec'y of Health & Human Servs., 985 F.2d 552, 1993 WL 21064, at *5 (1st Cir. 1993) (unpublished) ("Medical evidence generated after a claimant's insured

dated December 6, 2007, where plaintiff had last visited on November 8, 2007, Dr. Olivencia noted that she had chronic fatigue syndrome, shortness of breath, and progressive onset of severe fatigue. (Tr. 544; see also Tr. 193). Moreover, plaintiff was experiencing muscle and joint pain, headaches, "unrefreshing sleep," post-exertional malaise lasting more than 24 hours. (Tr. 545). Dr. Olivencia also noted that plaintiff had an "elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640." Id. With respect to mental impairments, Dr. Olivencia noted that plaintiff experienced short-term memory deficit, concentration limitations, depression, and anxiety. Id. According to Dr. Olivencia, on a typical workday, plaintiff would "constantly" experience "fatigue or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks," need unscheduled breaks every twenty minutes lasting twenty minutes or longer, and be absent from work more than four days per month. (Tr. 546–48).[4] Dr. Olivencia indicated that plaintiff's functional limitations would be "very poor" if she "were placed in a competitive work situation." (Tr. 546). She could never climb ladders or stairs and could rarely lift and carry less than ten pounds, twist, stoop, or crouch. (Tr. 547). Plaintiff also had "significant limitations in doing repetitive reaching, handling or fingering." (Tr. 548). For only one hour per workday, plaintiff could grasp, turn, or twist objects; conduct fine manipulations; and reach. Id. With respect to plaintiff's convulsions, Dr. Olivencia indicated in a treatment summary dated August 19, 2008, that she had been stable for the previous two years. (Tr. 193–94). Dr. Olivencia, however, noted that she was experiencing severe weakness.

---

status expires may be considered for what light (if any) it sheds on the question whether claimant's impairment reached disabling severity *before* his insured status expired." (emphasis in original)).

[4] Conclusions as to whether a claimant is "disabled" and related legal conclusions are administrative decisions that are to be made by the Commissioner, not by medical personnel. 20 C.F.R. § 404.1527(e); see Rivera v. Comm'r of Soc. Sec., Civ. No. 08-2281 (JAF), 2010 WL 132329, at *5 (D.P.R. Jan. 8, 2010) ("[W]hile [his physician] believed that [c]laimant was disabled and unable to work, disability under the Act is a legal determination that is reserved to the ALJ, and medical experts are not qualified to render this ultimate legal conclusion." (internal citation omitted) (citing Frank v. Banhart, 326 F.3d 618, 620 (5th Cir. 2003))).

Plaintiff visited ROVICO Clinic for Behavior Care and Treatment ("ROVICO") for mental health treatment on several occasions between December 4, 2007, and December 8, 2009. (See Tr. 201–05, 212–23, 234–49). Between April 28 and May 19, 2009, plaintiff received partial hospitalization services from ROVICO. (See Tr. 212–23). The mental examination revealed distracted attention and brief concentration. Nevertheless, plaintiff maintained preserved memory, normal thought process, and full orientation. The diagnostic impression included severe recurrent major depressive disorder, a mood disorder due to a general medical condition, and fibromyalgia. (See Tr. 220).[5] At admission, plaintiff's Global Assessment of Functioning ("GAF") score was 40, but was between 50 and 55 at discharge.[6]

Dr. Samuel Méndez Figueroa ("Dr. Méndez") completed a neurological evaluation of plaintiff on March 26, 2008. (See Tr. 559–66). He concluded that plaintiff had tender cervical and lumbar paraspinal muscles and strength of 4/5 symmetrically in all extremities, limited by pain. Dr. Méndez also noted that plaintiff had adequate memory and was alert, fully oriented, and cooperative. Dr. Méndez determined that plaintiff suffered from chronic lumbalgia and cervicalgia, and diffuse arthralgia with no sign of inflammatory changes. He also noted plaintiff's history of seizures.

---

[5] See Meléndez-Ojeda v. Comm'r of Soc. Sec., Civ. No. 11-1485 (CVR), 2012 WL 5199609, at *7 n.4 (D.P.R. Oct. 22, 2012).

[6] The GAF "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) [hereinafter DSM–IV], quoted in Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004). It "considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM–IV, at 34 (brackets omitted), quoted in Echandy-Caraballo v. Astrue, 2008 WL 910059, at *4 n.7 (D.R.I. Mar. 31, 2008). A GAF between 31 and 40 is "characterized by some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Halverson v. Astrue, 600 F.3d 922, 927 n.5 (8th Cir. 2010) (citing DSM–IV, at 34). A GAF between 41 and 50 "indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" Colón v. Barnhart, 424 F. Supp. 2d 805, 809 n.3 (E.D. Pa. 2006) (quoting DSM–IV, at 34). A GAF between 51 and 60 "indicates the individual has '[m]oderate symptoms … or moderate difficulty in social, occupational, or school functioning ….'" Pate-Fires v. Astrue, 564 F.3d 935, 938 (8th Cir. 2009) (quoting DSM–IV, at 32).

On April 23, 2008, Dr. Alberto Rodríguez Robles ("Dr. Rodríguez") conducted a psychiatric examination of plaintiff. (See Tr. 573–76). Dr. Rodríguez noted that plaintiff was experiencing social isolation, restricted affect, depressed mood, "ideas of low self-esteem, abandon, and hopelessness," and diminished attention and concentration. (Tr. 574–75). Though slow, plaintiff's thought process was logical, coherent, and relevant. She had preserved memory, full orientation, and adequate judgment. The diagnostic impression was severe recurrent major depressive disorder, fibromyalgia, epilepsy, migraine, and falciform anemia. Dr. Rodríguez gave plaintiff a poor prognosis and concluded that she could not manage her own finances.

Dr. Fernando Torres Santiago ("Dr. Torres"), an internal medicine specialist, completed an evaluation dated September 2, 2008. (See Tr. 619–28). The evaluation indicates that plaintiff had a history of fibromyalgia, was experiencing episodic anxiety, and was not sleeping well. Plaintiff's lumbar flexion and extension was "performed with discomfort at extremes." (Tr. 622). Dr. Torres's evaluation indicates that plaintiff would take "common pain killer pills, muscle relaxant and NSAID" as the circumstance arose. (Tr. 619). He noted that plaintiff was taking Trileptal, Amantadine, Axert, Paroxetine, and Clonazepam. (Tr. 620). Dr. Torres diagnosed plaintiff with anxiety and indicated that she was "unable to do regular work." Id.

A laboratory test conducted on September 8, 2008, revealed a Trileptal level of 9 ug/mL, where the "limits" were 10 to 35. (Tr. 631). An MRI conducted on April 7, 2009, revealed normal findings. (Tr. 200).

### III.  ANALYSIS

Claims for disability benefits are evaluated according a five-step sequential process. See 20 C.F.R. § 404.1520; Barnhart v. Thomas, 540 U.S. 20, 24–25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Bowen v. Yuckert, 482 U.S. 137, 140–42 (1987). In this case, plaintiff only contests the ALJ's determination at the fifth and final stage of the

analysis. Although a claimant generally bears the burden of proving that he or she is disabled within the meaning of the Social Security Act, see id. at 146 n.5, 146–47, the Commissioner has the burden at the fifth stage "to prove the existence of other jobs in the national economy that the plaintiff can perform." Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (per curiam). Typically, as here, when "a non-exertional impairment 'significantly affects claimant's ability to perform the full range of jobs' he is otherwise exertionally capable of performing," the Commissioner carries this fifth-stage burden "through the use of a vocational expert." Id. at 524 (quoting Lugo v. Sec'y of Health & Human Servs., 794 F.2d 14, 17 (1st Cir. 1986)).

In this case, plaintiff contends that the ALJ improperly disregarded Dr. Puig's testimony, in response to two hypothetical questions posed by *claimant's counsel*, that no jobs existed in the national economy that could be performed under such circumstances. The hypothetical posed by the *ALJ*, however, corresponded with the residual functional capacity ("RFC") she assigned to plaintiff. (Compare Tr. 19 with Tr. 41–42).[7] Dr. Puig testified that there were sedentary, unskilled jobs available under the ALJ's hypothetical. (Tr. 42–43).

In order for a vocational expert's testimony in response to an ALJ's hypothetical question to constitute substantial evidence in support of the Commissioner's decision, "the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." Arocho v. Sec'y of Health & Human Services, 670 F.2d 374, 375 (1st Cir. 1982). Nevertheless, "'the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.'" Simila v. Astrue, 573 F.3d 503, 521 (7th Cir. 2009) (quoting Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007)). As such, the inquiry depends on

---

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A job involving light work "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id.

6

whether there was substantial evidence from the medical authorities to support the inputs in the ALJ's hypothetical.

According to plaintiff, when reaching her RFC determination, the ALJ accorded insufficient weight to the evidence provided by Dr. Olivencia, ROVICO, and Dr. Rodríguez, all of whom were examining or treating sources. See ECF No. 18, at 3–4, 15–16, 19–23. The evidence from Dr. Olivencia, a specialist in internal medicine, encompasses both plaintiff's physical and mental limitations. The evidence from ROVICO and Dr. Rodríguez encompasses only plaintiff's mental limitations.

As an initial matter, with respect to Dr. Olivencia, plaintiff in particular takes issue with the ALJ's reference to "the lack of treatment notes." (Tr. 23). According to plaintiff, this statement runs afoul of the regulatory requirement that the ALJ accord "controlling weight" to a treating source's opinion when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." 20 C.F.R. § 404.1527(c)(2). Opinions of treating physicians may only be disregarded upon "a showing of good cause, namely: (1) that they are brief and conclusory, (2) not supported by medically acceptable clinical laboratory diagnostic techniques, or (3) are otherwise unsupported by the record." Carrasco v. Comm'r of Soc. Sec., 528 F. Supp. 2d 17, 25 (D.P.R. 2007) (citing Sánchez v. Comm'r of Soc. Sec., 270 F. Supp. 2d 218, 221 (D.P.R. 2003)). Certainly, "the absence of treatment notes *alone* d[oes] not show that [a medical] opinion [i]s not 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' …." Soto-Cedeño v. Astrue, 380 F. App'x 1, 3 (1st Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)) (emphasis added). In Soto-Cedeño, the physician, in his report, had "explained the basis for [the physician's] opinion" and, "[i]n particular, … described his observations of [plaintiff] and the

7

results of specific memory tests he had administered to her at her most recent appointment ...." Id.

Although, at the time of the hearing, Dr. Olivencia's treatment notes had not yet been submitted, (see Tr. 39, 45–46), they were subsequently produced on February 1, 2010. (See Tr. 251). In referring to a "lack of treatment notes," (Tr. 23), the ALJ was not indicating that Dr. Olivencia failed to submit treatment notes to support his conclusions. Rather, the ALJ pointed out that the treatment notes reflect "a noticeable gap of 18 months in treatment." (Tr. 23). According to the treatment notes, plaintiff had last visited Dr. Olivencia on August 19, 2008, as of February 1, 2010—a gap of approximately seventeen and a half months. Thus, the ALJ's reference to "the lack of treatment notes" from this period of time was to show that such an extended absence of treatment was inconsistent with a significant case of "seizures, fibromyalgia and chronic fatigue syndrome, conditions that are usually attended by intensive and extensive care, tests, adjustment of medications and doses." Id. The ALJ did not reduce the weight accorded to Dr. Olivencia's opinion merely "because no supporting treatment notes were attached to his ... report." Soto-Cedeño, 380 F. App'x at 3. The ALJ, however, cited the absence of treatment notes over a particular period of time to show an inconsistency with Dr. Olivencia's conclusions about the severity of plaintiff's conditions.

The ALJ does not disagree with Dr. Olivencia's assessment that plaintiff suffers from fibromyalgia, chronic fatigue syndrome, and seizures. Rather, the ALJ expressly concludes that plaintiff's severe impairments include fibromyalgia, chronic fatigue syndrome, and a history of petit mal seizures. (See Tr. 17).[8] The ALJ, however, did reduce the weight accorded to

---

[8] The ALJ determined that plaintiff did not have the severe impairments of asthma, migraines, or sickle cell trait. The ALJ noted the relative absence of references to asthma and migraines in the medical record, including treatment, hospitalizations, or medications. (See Tr. 18). With respect to sickle cell trait, the ALJ pointed out that plaintiff had been diagnosed since childhood and that the record did not establish any significant negative impact on

Dr. Olivencia's opinions as to the *extent* of said conditions. The ALJ based her decision, not only on the long gap in plaintiff's treatment, but also on her determination that Dr. Olivencia's opinions were unsupported by the record. For instance, the ALJ concluded that Dr. Olivencia's reference to plaintiff's "severe weakness" was "uncorroborated" and inconsistent with Dr. Méndez's examination, which "f[ound] her mostly neurologically intact." (Tr. 23).

Moreover, in coming to her determination about plaintiff's physical limitations, the ALJ relied also on the conclusions of state agency consultant Dr. Vicente Sánchez ("Dr. Sánchez"), affirmed by Dr. John Durfor. (See Tr. 577–86, 640). Upon a review of the medical record, Dr. Sánchez concluded that, despite her fibromyalgia, chronic fatigue syndrome, seizures, and sickle cell trait, plaintiff retained the capacity to lift or carry twenty pounds occasionally and ten pounds frequently, stand or walk for two hours, sit for six hours, and push or pull without limit. She had only "occasional[]" postural limitations, but no manipulative, visual, or communicative limitations. (Tr. 580–82).[9] While plaintiff points to miscellaneous specific findings such as her chronic fatigue syndrome, shortness of breath, fibromyalgia, and several self-reported symptoms, see, e.g., ECF No. 18, at 20–21; (Tr. 545), plaintiff has not identified how the existence of such findings are inconsistent with either Dr. Sánchez's conclusions or the ALJ's opinion.[10] As such, there was substantial evidence to support the ALJ's physical RFC determination and the physical-impairment component of her hypothetical to Dr. Puig.

---

her health or ability to do work. Id. In her memorandum, plaintiff does not appear to contest these determinations. See ECF No. 18.

[9] Dr. Sánchez also specified particular environmental limitations, reflected in the ALJ's RFC determination and hypothetical to the vocational expert. (See Tr. 19, 41, 582). In her memorandum, plaintiff does not appear to contest this aspect of the ALJ's opinion.

[10] Dr. Olivencia did answer questions pertaining to plaintiff's physical RFC, but, as described above, the ALJ provided reasons for discounting his conclusions. See Simila, 573 F.3d at 521 (noting that an ALJ need only incorporate into her hypotheticals "those impairments and limitations that he accepts as credible" (internal quotation omitted)).

With respect to plaintiff's non-physical limitations, plaintiff identifies several findings by ROVICO, Dr. Rodríguez, and Dr. Olivencia which she contends that "the ALJ ignored and did not posed [*sic*] to the Vocational Expert." ECF No. 18, at 19. For instance, plaintiff points out that ROVICO, Dr. Rodríguez, and Dr. Olivencia all determined that her "capacity for attention and concentration" was "impaired." ECF No. 18, at 4. Nevertheless, none of the evidence presented by plaintiff specifically indicated that she was not even able to sustain attention or concentration for a two-hour interval. Moreover, Dr. Méndez noted that plaintiff was alert, cooperative, and fully oriented. (Tr. 559–66). He made no finding that plaintiff exhibited reduced attention or concentration. Although Dr. Rodríguez noted diminished attention and concentration, he also indicated that plaintiff had logical, coherent, and relevant thought process; full orientation; and adequate judgment. (Tr. 573–76). Plaintiff also contends that she experienced memory impairment. The only evidence of memory impairment presented by plaintiff in her summary of the medical evidence, see ECF No. 18, at 7–11, is Dr. Olivencia's indication that she experienced short-term memory deficit. (Tr. 545). In contrast, both Dr. Méndez and Dr. Rodríguez indicated that plaintiff had preserved memory.

Although there was evidence that plaintiff experienced diminished motor activity, social isolation, and severe major depression, she has not provided evidence from the medical record indicating that the same is inconsistent with the ALJ's mental RFC determination. The ALJ specifically noted plaintiff's moderate difficulties in social functioning, including her irritability. (Tr. 18). Moreover, the ALJ identified depression as a severe impairment. (Tr. 17). Upon a review of the medical record, specifically noting evidence of psychomotor retardation, Dr. Luis Umpierre ("Dr. Umpierre"), a state agency psychologist, determined that plaintiff was able to sustain concentration for at least a two-hour interval and complete a normal workday and

workweek that does not require dealing with complex and detailed procedures. (Tr. 587). Plaintiff has not shown how any evidence from the record—whether from ROVICO, Dr. Rodríguez, Dr. Olivencia, or any other medical source—is inconsistent with Dr. Umpierre's conclusions.

Ultimately, the Commissioner's decision must be affirmed "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz, 955 F.2d at 769 (internal quotation omitted). The standard for "substantial evidence" requires "'more than a mere scintilla of evidence but may be somewhat less than a preponderance' of the evidence." Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). "It is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam). Because substantial evidence supports the ALJ's opinion in this case, it must be affirmed.

### IV. CONCLUSION

Based on the foregoing analysis, the Court concludes that the decision of the Commissioner was based on substantial evidence. Therefore, the Commissioner's decision is hereby **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 16th day of September, 2013.

s/Marcos E. López
U.S. Magistrate Judge